IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 3, 2004 Session

## JULIE JILES, ET AL. v. STATE OF TENNESSEE

**Appeal from the Claims Commission for the Eastern Division**
**No. 99000266     Vance W. Cheek, Jr., Commissioner**

**FILED APRIL 13, 2004**

**No. E2003-01005-COA-R3-CV**

Julie Jiles ("Plaintiff")[1] and her husband, Bryan Jiles[2], sued the State of Tennessee ("State") for medical malpractice regarding medical care Plaintiff received at the Sevier County Health Department. The case was tried before the Claims Commission and an Order of Judgment was entered in March of 2003, holding, *inter alia*, that the standard of care was not breached and dismissing Plaintiff's case. In dicta, the Judgment also suggested that another health care provider was the proximate cause of Plaintiff's damages. Plaintiff appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Claims Commission Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, and CHARLES D. SUSANO, JR., JJ., joined.

James L. Milligan, Jr., Knoxville, Tennessee, for the Appellants, Julie Jiles and husband, Bryan Jiles.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Mary M. Bers, Senior Counsel, for the Appellee, State of Tennessee.

---

[1] For purposes of simplicity, we refer to Plaintiff in the singular in this Opinion with the understanding that both Julie Jiles and Bryan Jiles are named plaintiffs in this action.

[2] Mr. Jiles is listed as Bryan Jiles in the style of this case, but he stated at trial that his name is Adrian Carl Jiles.

# OPINION

## Background

Plaintiff and her husband filed a claim against the State alleging the Sevier County Health Department ("Health Department") negligently failed to recommend timely treatment for multiple abnormal Pap smears and as a result, Plaintiff later was diagnosed with carcinoma in situ. Plaintiff further claims that she underwent a hysterectomy at the age of twenty-seven that would not have been necessary except for the Health Department's negligence. The case was transferred to the Claims Commission ("Commission") and was tried before the Commission in early 2003.

Plaintiff, who gave birth to a son in 1994, and a daughter in 1995, testified she was made aware of her first abnormal Pap smear when she was pregnant with her son. She was being treated at the time by her primary care physician, Dr. Brooks. Plaintiff states that because she was pregnant, Dr. Brooks did not provide services to treat her, and so she found another physician, Dr. Bozeman. Dr. Bozeman performed a Pap smear on Plaintiff at the beginning of her pregnancy with her son, a repeat one after the birth of her son, and another one when she became pregnant with her daughter. The Pap smear Dr. Bozeman did in April of 1995, while Plaintiff was pregnant with her daughter, showed borderline atypical cells. Plaintiff's chart reflects that Dr. Bozeman recommended Plaintiff have a colposcopy at her six week postpartum checkup after her daughter's birth. Dr. Bozeman delivered both children, but Plaintiff did not return to him for her six week postpartum checkup after the birth of her daughter because Plaintiff had no insurance. Instead, Plaintiff went to the Health Department approximately nine months after giving birth to her daughter to obtain contraceptives and follow-up treatment for her previous abnormal Pap smear.

As part of Plaintiff's first appointment, care-givers at the Health Department took a detailed history from Plaintiff and did a Pap smear. Plaintiff reported to them that she had a history of abnormal Pap smears and told the nurse taking the history that the Pap smear done by Dr. Bozeman in April of 1995, showed moderate to severe dysplasia. Plaintiff states the first Pap smear done by the Health Department came back atypical with no moderate to severe dysplasia noted. Plaintiff was instructed to return for a repeat Pap smear in three months. Plaintiff returned to the Health Department for another Pap smear in October of 1996. This Pap smear showed "atypical squamous cells of undetermined significance. Mildly atypical squamous cells, cannot rule out dysplasia." Although Plaintiff's chart reflects that the test should be repeated in three months, Plaintiff does not recall anyone from the Health Department telling her to return in three months.

Plaintiff next had a Pap smear done by the Health Department in April of 1997. She scheduled the appointment for this test after receiving a letter from the Health Department telling her she needed to follow up and make an appointment. The April Pap smear result was "low grade squamous intraepithelial lesion, mild to moderate dysplasia. Recommend colposocopy, biopsy and endocervical curettage." Tracy Price, a registered nurse and public health nurse at the Health

Department, made the arrangements for Plaintiff to have a colposcopy done at UT Family Practice.

The colposcopy and a biopsy were done in June of 1997. The results showed carcinoma in situ. Plaintiff states she was told she needed a repeat colposcopy "because the biopsy was inconsistent with the colposcopy impression and the Pap smear results . . . ." At that point, Plaintiff was concerned because her next appointment with the Health Department was several months away, in September. She talked to Tracy Price several times via telephone about having the appointment moved up, and in August went to Ms. Price's office.

Plaintiff says Ms. Price suggested that Plaintiff was being "a little bit irrational." Plaintiff told Ms. Price she was going to see a private physician to get a second opinion to see if it was okay to wait another thirty days before taking any action. Plaintiff says Ms. Price described Plaintiff's condition as baby cancer. Ms. Price, however, denies telling Plaintiff she had baby cancer or that she was being irrational.

Plaintiff took her records and went back to Dr. Brooks. Dr. Brooks did a Pap smear and referred Plaintiff to Dr. James Hays. Plaintiff saw Dr. Hays on Friday, August 22, 1997. Dr. Hays performed a colposcopy and did a Pap smear and some blood work and told Plaintiff she had carcinoma in situ. Plaintiff states she was given two treatment options, a cold knife cone biopsy or a hysterectomy. She chose the hysterectomy because she understood that with a cone biopsy there would be a chance the condition could reoccur. Plaintiff states Dr. Hays "could give me a 100 percent guarantee that I would never have the carcinoma return on my cervix because, of course, I wouldn't have [a cervix]", and that she was concerned about staying alive to raise her two small children. Dr. Hays attempted to do the hysterectomy that same day, on Friday afternoon, but was unable to schedule an operating room on such short notice. The hysterectomy was performed three days later on Monday, August 25, 1997. Plaintiff and her husband state they had planned to have more children and now cannot.

Dr. Hays testified Dr. Brooks referred Plaintiff to him in August of 1997 for a hysterectomy. He states he discussed with Plaintiff her options of hysterectomy versus more conservative surgery and that Plaintiff was "really very motivated, I think, to proceed [with a hysterectomy], because she had been having some abnormal Pap smears prior to that." Dr. Hays explained that hysterectomy "reduces the complexity of follow-up. It reduces just the simple fear factor. That, you know, is a reasonable thing. The recurrence rate of CIS in the cervix as treated conservatively is roughly 5 percent. The recurrence rate after a hysterectomy is less than 1 percent."

Dr. Erlich, Plaintiff's expert witness, opined that the Health Department fell below the standard of care because they did not immediately refer Plaintiff to a gynecologist based upon the history she gave and also because they did not refer Plaintiff for colposcopy or biopsy after the October 1996 Pap smear. Dr. Erlich thinks the Health Department should have referred Plaintiff to a gynecologist without even doing a Pap smear after she gave them her history. However, the Health Department protocol introduced at trial requires that a Pap smear be done at all initial visits unless the patient had a documented Pap smear within the last three months or was menstruating or

had douched within the past 48 hours.  Plaintiff did not fit any of the exceptions and the protocol requiring a Pap smear was followed during Plaintiff's initial visit to the Health Department.

Dr. Erlich explained that treatment options other than a hysterectomy were available to Plaintiff.  These other possible treatments included surgeries that would remove the abnormal area of the cervix, but leave the cervix and uterus intact.  He also explained that Pap smears are a screening test and are not 100% accurate.  Dr. Erlich believes it is the standard of care to obtain prior Pap smear results and states it would be a deviation from the standard of care not to take into account prior abnormal Pap smears.  However, Dr. Erlich admits you don't have to get the actual piece of paper but can get the information over the phone or, if the patient is knowledgeable, get the information from the patient.

Tracy Price testified it is not in the Health Department protocol to "always obtain [prior] medical records."  Instead, they take a detailed history from the patient.  Ms. Price testified that the State Health Department protocol labeled "Pap Smear Guidelines" introduced at trial contains the protocol in effect when Plaintiff was seen at the Health Department.  This protocol contains a decision tree to assist in determining the proper follow-up procedure given a specific Pap smear result.

Ms. Price testified that during Plaintiff's October 1996 visit to the Health Department, Ms. Price instructed Plaintiff to return in three months.  Plaintiff did not return to the clinic until April of 1997.  Plaintiff disputes being told in October of 1996 to return in three months.  She says she was given medication for an infection and told to return if her infection did not clear up.  Ms. Price sent Plaintiff a letter in November of 1996, and a second one in February of 1997 after Plaintiff did not return in three months.  Considering Plaintiff's Pap smear results, the protocol required that the Health Department make either two attempts by mail, or by mail and telephone, to reach Plaintiff when she did not return in January as instructed.  Clearly the Health Department did contact Plaintiff, and Plaintiff called and made an appointment as a result of this contact.  Plaintiff states she received only one letter and when she called to make an appointment was unable to schedule one until April.

Ms. Price testified that it was only Plaintiff's last Pap smear, the one done in April of 1997, that put her within the section of the protocol decision tree to be referred for colposcopy.  When the results of this Pap smear were received from the lab, the Health Department did refer Plaintiff for colposcopy.  The previous Pap smears done by the Health Department placed Plaintiff into the category necessitating a repeat Pap smear only.

Helen Lynn Smith, a now-retired nurse practitioner who provided care to Plaintiff at the Health Department, explained that "[d]ysplasia is related to changes in the cells of the cervix. That can be caused by more commonly viruses, like the HPV.  It is not cancer.  It can progress.  It can regress."  Ms. Smith testified that a Pap smear was required stating:

-4-

it's one of - - part of the seven core exams that's required federally for a person coming into the Family Planning Clinic. There are exceptions when it isn't done, but for a person who has a recent abnormal Pap or a history of abnormal Pap, I would not refer her to anybody until I had a Pap smear report in hand to send with her because most times you cannot get a - - we could not get an appointment for them to be seen unless we had data, some sort of data in hand to refer.

During her career, Ms. Smith worked as part of the medical advisory board for the statewide family planning program that developed the protocol for the state. Pap smear guidelines come from the federal government and state what the minimum standards are. The various states then take these guidelines and make them applicable to their own situations. At trial, the witnesses often used "guidelines" and "protocol" interchangeably, which is explained by the fact that the protocol is actually titled "Pap Smear Guidelines" because it adopts the federal and state guidelines. There was no dispute, however, as to what was the actual adopted Pap smear protocol. Ms. Smith was responsible for writing the regional protocol with input from other nurse practitioners. The protocol would constitute the standard of care. The guidelines provided that "Pap smear follow-up of clients is managed by the professional judgment of the clinician/physician, protocol, and/or recommendation of the pathologist." Ms. Smith testified this was included in the protocol in the region encompassing Sevier County when Plaintiff received care at the Health Department.

Nina Brimer, a nurse practitioner who provided care to Plaintiff at the Health Department, testified that even though Plaintiff reported a history of abnormal Pap smears, they still needed to get their own documentation and it would not have changed the plan of care or what they did at that time. Ms. Brimer testified "it's not in our protocol to get the [prior medical] records …." Instead, Ms. Brimer stated that they needed to know what was going on at that time to determine the plan of care. She explained that the reason for repeat Pap smears is because they don't know if dysplasia is going to progress or regress. Ms. Brimer states the body "can heal itself from a lot of different things."

Dr. Dunworth, the State's expert witness, testified that given the fact Ms. Jiles had seen multiple providers in the past and gave a somewhat confusing history, the Health Department did the correct thing by starting with their own Pap smear to see where to go from there. Dr. Dunworth opines that it would not be the standard of care for the Health Department to obtain previous medical records. Instead, Dr. Dunworth states that would have been a luxury.

Given the results of the Pap smears done by the Health Department, Dr. Dunworth opined it was appropriate to follow-up by repeating the test in three months. He also stated that if someone wants to preserve their child-bearing ability, the appropriate treatment for carcinoma in situ is a cone biopsy, not a hysterectomy.

Dr. Erlich, Plaintiff's expert witness, reviewed the Health Department protocol introduced at trial. Dr. Erlich testified the protocol was similar to other guidelines he had used over

the years and that he saw no major changes or deviations from the National Institutes of Health guidelines.

After trial, the Commission entered an Order of Judgment on March 27, 2003, holding, *inter alia*, that the document labeled "Pap Smear Guidelines" introduced at trial reflected the "established standard of care," there had been no breach of this standard of care, and the State was not the proximate cause of the damages suffered by Plaintiff. The order also states:

> It is the opinion of the Claims Commission, in dicta, that Dr. Hayes (sic) is the proximate cause of the claimants' damages.

> It shocks the Commissioner's sense of decency to think that Mrs. Jiles would go in for an appointment with Dr. Hayes (sic) in the morning and would be, in essence, convinced to go onto an operating table that afternoon, had it not been for the fact that Dr. Hayes (sic) could not get a table for the afternoon. . . . It seems to the Claims Commission that this was a rush to judgment, and that Mrs. Jiles was, in fact, a victim of a rush to judgment in this circumstance.

The order dismissed Plaintiff's case. Plaintiff appeals to this Court.

### Discussion

Although not stated exactly as such, Plaintiff raises two issues on appeal: 1) whether the State committed medical malpractice that caused Plaintiff to undergo an unnecessary hysterectomy; and 2) whether the Commission erred by imputing negligence to an unnamed party, Dr. Hays.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, here the Commission, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

Medical malpractice actions in Tennessee, such as this case, are governed by Tenn. Code Ann. § 29-26-115, which provides, in pertinent part:

> (a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the

community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115 (a) (Supp. 2003).

In its March 2003 order, the Commission found that "the standard of care is reflected in the State Health Department protocol . . ." labeled "Pap Smear Guidelines" that was made an exhibit at trial. We need not discuss the evidence yet again relevant to what is the applicable standard of care as that evidence has been discussed already in this Opinion. We are unable to say from the evidence contained in the record that the evidence preponderates against the Commission's finding that "the standard of care is reflected in the State Health Department protocol . . ." labeled "Pap Smear Guidelines" which was introduced as an exhibit at trial.

The Commission then found there was no breach of the applicable standard of care. Ms. Price testified that it was only Plaintiff's last Pap smear, the one done in April of 1997, that under the protocol, triggered the need for a referral for a colposcopy. The previous Pap smears done by the Health Department placed Plaintiff into the category necessitating a repeat Pap smear only. The State Health Department protocol introduced at trial supports these assertions. In addition, Ms. Smith testified that dysplasia could progress or regress and that she would not refer a patient to anybody until she had a Pap smear report in hand to send with the patient. Ms. Brimer testified that dysplasia can progress or regress and that it was important to do a Pap smear to determine what Plaintiff's condition was at that point in time.

Plaintiff's expert witness, Dr. Erlich, opined that the Health Department should have referred Plaintiff to a gynecologist without even doing a Pap smear after she gave them her history. However, Ms. Smith's testimony established that she would not refer a patient to anyone without having current data in hand regarding the patient's condition. In addition, the Health Department protocol introduced at trial requires that a Pap smear be done at all initial visits unless the patient had a documented Pap smear within the last three months or was menstruating or had douched within the past 48 hours. Plaintiff did not fit any of the exceptions and, thus, a Pap smear was required by the protocol during her initial visit to the Health Department.

Dr. Erlich also believes it is the standard of care to obtain prior Pap smear results and that it would be a deviation from the standard of care not to take into account prior abnormal Pap smears. Dr. Erlich did admit, however, it was not necessary to get the actual piece of paper, but that the information could be obtained from the patient. That is exactly what was done in this case. The Health Department obtained a detailed history from Plaintiff and the chart shows Plaintiff disclosed

that she had a history of previous abnormal Pap smears, which was taken into account by the care-givers at the Health Department. Dr. Erlich agreed that the Health Department protocol introduced at trial was similar to other guidelines he had used over the years, and he saw no major changes or deviations in this protocol from the National Institutes of Health Guidelines.

Certainly the evidence was disputed as to whether or not the care and treatment provided by the Health Department met the applicable standard of care. Plaintiff's proof was that it did not. Defendant's proof was that it did. As is often the case, the fact finder, here the Commission, was faced with this conflicting proof. The evidence shows the Health Department followed its protocol, which details the applicable standard of care. The evidence does not preponderate against the Commission's finding that the Health Department did not breach the applicable standard of care. We affirm on this issue.

We next consider whether the Commission erred by imputing negligence to an unnamed party, Dr. Hays. The March 2003, order states "[i]t is the opinion of the Claims Commission, **in dicta**, that Dr. Hayes (sic) is the proximate cause of the claimants' damages." We note that this opinion expressed by the Commission as dicta had no bearing whatsoever upon the Commission's finding that the Health Department did not breach the applicable standard of care, as discussed above. Even if there were error in regard to this issue, such error would be harmless as the Health Department did not breach the standard of care and Plaintiff, therefore, failed to prove the necessary elements of her claim.

## <u>Conclusion</u>

The judgment of the Claims Commission is affirmed, and this case is dismissed with this cause being remanded to the Claims Commission solely for collection of the costs below. The costs on appeal are assessed against the Appellants, Julie Jiles and husband, Bryan Jiles, and their surety.

_____
D. MICHAEL SWINEY, JUDGE

-8-